

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-13-00205-CV

---

KIP ALLISON                                              APPELLANT

V.

CONGLOMERATE GAS II L.P.,                                APPELLEES
CRESTVIEW FARM 250 L.P.,
CRESTVIEW FARM, L.L.C.,
CRESTVIEW FARM, L.L.C. "A
MONTANA LLC," CRESTVIEW
FARM AIKEN LLC, THE BARNETT
SHALE WATER CONSERVATION
CO., CONGLOMERATE GAS,
L.L.C., CONGLOMERATE GAS I,
L.P., CONGLOMERATE HOLDING
LLC, CONGLOMERATE GAS III
L.P., DAN MEEKER
MANAGEMENT, INC.,
VANCOUVER SKY MANAGEMENT
LLC, TRACY BOLT AS TRUSTEE
OF DAVID ALAN MEEKER FAMILY
IRREVOCABLE TRUST, THOMAS
BALLARD AS TRUSTEE OF THE
DAN H. MEEKER CHILDREN'S
IRREVOCABLE TRUST, AND
CLIFFORD W. GINN

----------

FROM THE 342ND DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 342-236004-09

----------

# MEMORANDUM OPINION[1]

----------

Kip Allison challenges a sanctions order against him arising from pleadings he filed for his client in the underlying suit.[2] In five issues, Allison contends that the trial court abused its discretion by awarding sanctions because (1) there is no evidence supporting the trial court's determination that the invasion of privacy claim was groundless or that it was brought in bad faith or for purposes of harassment or delay, challenging the award of rule 13 sanctions (issues one and two); (2) there is no evidence supporting the trial court's determination that the invasion of privacy claim was brought for an improper purpose, challenging the imposition of sanctions under chapter 10 of the civil practice and remedies code (issue three); and (3) there is no evidence supporting the award of sanctions for Allison's attachment of an improperly notarized affidavit to a response to a motion for summary judgment (issue four). Allison also challenges the amount of sanctions as excessive and complains that the evidence of attorney's fees upon which the sanctions were based was not properly segregated (issue five). We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

[2]This appeal was originally submitted with oral argument on May 13, 2014. On February 13, 2015, the appeal was assigned to a new panel and author. After appellant moved for oral argument before the new panel, the appeal was resubmitted with oral argument on April 14, 2015.

**Background**

Mindy (Wife) and Alan (Husband) Meeker were married in 2002 and had two children. During the marriage, Husband worked for businesses "owned within [his] family or operated by and among family members." These include the nontrust appellees[3] (the Companies). In addition, both Husband and his brother Dan Meeker created trusts (the Trusts) for their minor children.[4] In this opinion, we will refer to the Companies and the Trusts collectively as the Meeker Entities.

Wife and Husband separated in late summer or fall 2008. On the morning of November 8, 2008, a Saturday, Wife entered the office of the Meeker Entities.[5] She brought a computer specialist with her. While there, she took documents related to the Meeker Entities. In addition, although the computer specialist testified that he tried but failed to install a keylogger program on one of the computers in the office, a forensic examination of Husband's computer showed that spyware had been installed at approximately 10:20 a.m. on November 8,

---

[3]Conglomerate Gas II L.P., Crestview Farm 250 L.P., Crestview Farm, L.L.C., Crestview Farm, L.L.C. "A Montana LLC," Crestview Farm Aiken LLC, The Barnett Shale Water Conservation Co., Conglomerate Gas, L.L.C., Conglomerate Gas I, L.P., Conglomerate Holding LLC, Conglomerate Gas III L.P., and Vancouver Sky Management LLC. The Companies are primarily owned by the Trusts (defined below). Although Dan Meeker Management, Inc. is solely owned by Husband's brother, we will also include it in our references to the Companies.

[4]The David Alan Meeker Family Irrevocable Trust and the Dan H. Meeker Children's Irrevocable Trust.

[5]The Meeker Entities alleged that Wife's mother and brother assisted her.

2008, during the time Wife and the computer specialist were in the office. Later that day, Wife met with Allison at his office and gave him at least some of the documents. Husband and his brother were both out of town when this occurred, but Husband's brother discovered the entry the following Monday, November 10, when he viewed surveillance video for the building.

Allison filed a divorce petition for Wife on November 21, 2008 in the 325th District Court of Tarrant County. On December 2, 2008, Jason Nash, one of the attorneys for the Meeker Entities, sent Allison a letter alleging that Wife had entered their office without consent, installed spyware on a laptop, and taken documents related to the Meeker Entities; he expressed the Meeker Entities' demand that all materials taken and all matters intercepted from the laptop be returned to them. On December 15, 2008, Allison served discovery on each of the Companies except for Dan Meeker Management, Inc. Two days later, Allison responded to Nash's letter: "I am in receipt of your letter and will provide a more detailed response next week. Until then, any and all documents associated with this case are being maintained in my office and not being disseminated in any fashion." On December 22, 2008, Bill Warren, the Meeker Entities' lead counsel, sent a letter acknowledging Allison's response but continuing to demand the return of documents and information.

On January 30, 2009, the associate judge in the divorce case—the Honorable Terri White—issued temporary orders enjoining both parties from allowing Wife's boyfriend to be in the children's presence or to treat them as their

4

pediatrician.  Husband became concerned that Wife was violating the order, so he asked a private investigator to perform surveillance when Wife had possession of the children.

On February 17, 2009, the Meeker Entities sued Wife, her mother, and her brother[6] in the 342nd District Court of Tarrant County for claims related to Wife's entry of the office in November 2008.  They sought a temporary restraining order as well as damages.  In partial response, Allison forwarded the trial court an original and one copy of "documents in our possession pertaining to Conglomerate Gas."  In April 2009, the parties agreed that the trial court should forward those documents to the Meeker Entities' attorneys.

In May 2009, Wife responded to the Meeker Entities' discovery by refusing to answer any questions on Fifth Amendment grounds.  On May 14, 2009, Allison filed a motion to amend the temporary orders in the divorce, seeking among other things that the trial court enjoin Husband from "[d]irecting private investigators to follow Wife and/or the children."  Although Associate Judge White had several hearings related to other specific requests in the motion, she did not issue a ruling on the request to enjoin the surveillance, and Allison did not bring the issue to her attention by requesting a hearing or presenting evidence on that part of the motion.[7]  According to an affidavit from Jim Loveless, Husband's

---

[6]They added the computer specialist in a later petition.

[7]Allison described a series of housekeeping-type hearings on the temporary orders motion taking place over a series of months.

5

divorce attorney, all of the parties, their counsel, the trial court, an amicus attorney appointed for the children, and a counselor for the children knew about the ongoing surveillance at the time. Additionally, Loveless averred that while the parties were working out access issues with the amicus attorney at Judge White's direction, the amicus told them not to point out or acknowledge to the children "the security personnel" who were doing the surveillance.

In August 2009, the presiding judge in the divorce—the Honorable Judith Wells—signed an order dismissing a master in chancery that she had previously appointed but indicating that she would re-appoint one if additional discovery issues arose. She also clarified a prior ruling she had made that Wife could not conduct discovery related to the Companies until Wife proved that there was a community property interest in them.

In November 2009, the trial court in the instant suit denied a motion for summary judgment that Wife had filed on behalf of all the then-named defendants. Thereafter, the Meeker Entities filed a Third Amended Petition.

Meanwhile, in the divorce case, Judge Wells heard a second motion to end the surveillance and verbally ordered the surveillance to cease; she signed an order to that effect on April 6, 2010, also ordering Husband to request the trustee of his children's trust to stop paying for any surveillance. The evidence shows that the surveillance could have ended as early as December 31, 2009 but no later than February 12, 2010.

On June 15, 2010, while the parties were present at the courthouse negotiating terms in an attempt to settle before the final divorce trial, Wife terminated Allison's representation of her in the divorce. She retained Barbara Nunneley, who had been Allison's co-counsel, solely for the purpose of assisting her with the settlement and any associated paperwork. Wife and Husband entered into an informal rule 11 agreement, resolving all issues in the divorce. Judge Wells allowed Allison's withdrawal and the substitution of Nunneley and approved the rule 11 agreement. Tex. R. Civ. P. 11.

During the prove-up of the rule 11 agreement, Loveless told Judge Wells that "there would be mutual[] releases executed between" representatives of the Meeker Entities, Wife's mother and brother, and Wife and that Warren had already prepared a release document and would circulate it the next day. Loveless represented that the agreement would end "all the litigation that's within the Meeker family and in [Wife's] family." Nunneley agreed with Loveless's description of the agreement. The rule 11 agreement contained the following about the release:

> Communication has been made to counsel for the trust (and trust entities) as to whether or not the trust and trust entities will execute a mutual release of all claims and civil liabilities that may have been claimed or could have been claimed in the past or present and to enter a dismiss[al] with prejudice of the lawsuit pending in the 342nd Judicial District Court. This release is separate from this agreement.

Warren emailed the release to Loveless three days later, and Loveless forwarded the email to Nunneley. Because Warren had not heard from

7

Nunneley, he called her on July 6, 2010. Nunneley told Warren that Wife was supposed to be coming into her office, so he emailed Nunneley an amended release draft the next day. In his email, he noted (1) that it had "recently become [his] understanding that [Wife], at some point, approached another lawyer(s) to put together yet another lawsuit against the trust and/or its entities" and (2) that he had accordingly amended the release document to broaden its scope and to add Wife's "acknowledgement that the Trustee and Co-Trustee of the David Alan Meeker Family Irrevocable Trust have not breached their duties and obligations owed under the trust document, that after receiving an accounting the amicus attorney decided not to allege any claim against them in the family court proceeding, and that [Wife] agrees with that decision of the amicus attorney." Warren never received any response about the release.

On July 26, 2010, Warren faxed Allison a letter inquiring whether he was still the attorney in charge for Wife in this suit. Allison responded by fax on July 28, 2010, stating only, "In response to your correspondence yesterday, please be advised I am still representing [Wife] in connection to this matter."

On July 29, 2010, Allison filed a claim for Wife in this suit against the Meeker Entities alleging claims for intrusion of privacy (seclusion) and aiding and abetting,[8] related to the surveillance that had taken place during 2009 and possibly the early part of 2010. She also named one of the private investigators

_____

[8]We have collectively referred to Wife's claim as her invasion of privacy claim.

8

who had performed the surveillance—Clifford W. Ginn—as a third party defendant. In the filing, Wife pled as follows: (1) "Counter-Plaintiff [Wife] *is* followed, spied upon, harassed and placed in danger by Counter-Defendant's conduct"; and (2) "Counter-Defendant's intrusions have placed Counter-Plaintiff in danger and without court relief [she] *will remain* in danger." [Emphasis added.] She also pled for both damages and injunctive relief.

On August 6, 2010, Nunneley wrote Loveless and Warren stating that her representation of Wife had ended with the signing of a Corrected Final Decree of Divorce on August 4, 2010.

On September 20, 2010, the Meeker Entities filed a motion for traditional summary judgment, claiming that they had conclusively proven their claims against Wife and the other defendants. They also sought a summary judgment on Wife's invasion of privacy counterclaim. Ginn also filed a motion for summary judgment with his answer to the invasion of privacy claim. The Meeker Entities and Ginn also filed separate motions for sanctions against both Wife and Allison. Both motions for sanctions alleged violations of both chapter 10 of the civil practice and remedies code and rule 13. Tex. Civ. Prac. & Rem. Code Ann. §§ 10.001–.006 (West 2002); Tex. R. Civ. P. 13.

Allison filed Wife's response to the motions for summary judgment in October 2010 and attached a document purporting to be a sworn affidavit from Wife (the Purported Affidavit). In it, she attempted to explain that she had not entered the Meeker Entities' office without permission, that she was only looking

9

for evidence of the community estate because all of her and Husband's personal paperwork had been kept at the offices, and that she had only accessed Husband's laptop, not anyone else's. She denied having put spyware on any laptop or taking any items with her when she left. The Purported Affidavit also contained representations that no one had permission to follow her, that her children had been having nightmares because of the surveillance, that she had lost friends because of it, and that it was causing her to be fearful. Finally, the Purported Affidavit also contained this statement, "When the divorce was settled by agreement on June 15, 2010, both [Husband] and his attorneys agreed as part of the divorce that this case and all claims against me in this case would be dismissed."

The trial court held a hearing on appellees' motions for summary judgment on October 22, 2010 but did not rule and instead took the motions as well as their motions for sanctions under advisement.

In March 2011, the trial court granted summary judgment for the Meeker Entities on their claims against Wife and also granted summary judgment for all appellees on Wife's invasion of privacy claim. The trial court initially set a trial on damages for April 2011, but Wife asked for it to be continued. At the hearing on her motion for continuance, Wife told the trial court, for the first time, that Allison had filed documents in the suit without her permission and that she had not communicated with Allison since August or September 2010. In the midst of

10

these settings and hearings on continuance motions, Allison filed a motion to withdraw from representing Wife in this suit.

On May 23, 2011, the Meeker Entities entered into an agreed judgment with Wife's mother and brother in which Wife's mother and brother agreed to be permanently enjoined from entering property owned or controlled by the Meeker Entities, Husband, or Husband's brother. The next day, Wife filed a notice of nonsuit of her invasion of privacy claim. Although Wife sought a continuance of the trial on damages on the Meeker Entities' claims against her that same day, the trial court denied it and proceeded to hear testimony over a two-day period.

In June 2011, the Meeker Entities filed an amended motion for sanctions. In his response, Allison pled that Wife had "represented to [him] . . . that the civil litigation had also been resolved in the divorce settlement and *nothing more would be need[ed] for that litigation.* That proved not to be true when in September 2010, [Husband] filed a No Evidence Summary Judgment, to which . . . Allison prepared and filed a timely response on October 14, 2010." [Emphasis added.] He also attached email correspondence between Wife and his paralegal indicating that Wife had signed and faxed back her purported affidavit to the paralegal the same day it was filed with the summary judgment response.

On June 30, 2011, the trial court signed a judgment awarding the Meeker Entities damages for Wife's violations of the Texas Theft Liability Act, harmful access by computer, and trespass.

The trial court heard the motions for sanctions on four separate days from June through October 2011. Ultimately,[9] the trial court signed a twenty-page order containing detailed findings. The trial court ordered (1) Wife individually to pay sanctions of $6,324 for agreeing to but failing to attend one of the sanctions hearings and for filing, withdrawing, and failing to attend a hearing on a motion for new trial that she had filed pro se, (2) Allison individually to pay sanctions of $2,967.24 for filing the Purported Affidavit in response to appellees' summary judgment motions, and (3) Wife and Allison to pay jointly and severally $16,758 in sanctions for the Meeker Entities' reasonable and necessary attorney's fees— and $18,600 for Ginn's reasonable and necessary attorney's fees and lost time— in defending the invasion of privacy claim and in bringing and presenting their motions for sanctions.[10] The trial court signed an amended final judgment incorporating the sanctions and an order nonsuiting Wife's invasion of privacy claim.

### Standard of Review and Applicable Law on Sanctions

Appellees moved for sanctions under rule 13 and chapter 10 of the civil practice and remedies code. Tex. Civ. Prac. & Rem. Code Ann. §§ 10.001–.006; Tex. R. Civ. P. 13. We review a sanctions award under either of these

---

[9]The trial court vacated the June 30, 2011 judgment on the last day of plenary power so that it could include the sanctions in its final judgment.

[10]We do not address the propriety of sanctions as to Wife because she did not appeal. *See State Office of Risk Mgmt. v. Foutz*, 279 S.W.3d 826, 829 (Tex. App.—Eastland 2009, no pet.).

authorities for an abuse of discretion. *Nath v. Tex. Children's Hosp.*, 446 S.W.3d 355, 361 (Tex. 2014). A sanctions award that fails to comply with due process constitutes an abuse of discretion because a trial court has no discretion in determining what the law is or applying the law to the facts. *Id.* But a trial court does not abuse its discretion by awarding sanctions if some evidence supports its decision. *Id.*

Section 10.001 of the civil practice and remedies code provides that a signatory to a pleading attests that

> (1) the pleading or motion is not being presented for any improper purpose, including to harass or to cause unnecessary delay or needless increase in the cost of litigation;

> (2) each claim, defense, or other legal contention in the pleading or motion is warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

> (3) each allegation or other factual contention in the pleading or motion has evidentiary support or, for a specifically identified allegation or factual contention, is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

> (4) each denial in the pleading or motion of a factual contention is warranted on the evidence or, for a specifically identified denial, is reasonably based on a lack of information or belief.

Tex. Civ. Prac. & Rem. Code Ann. § 10.001. A trial court may monetarily sanction only an attorney who files an unfounded pleading under section 10.001(2) and not a represented party. *Id.* §§ 10.001(2), 10.004(a), (d). Pleadings that are groundless and also filed either (1) in bad faith, (2) with the

13

intent to harass, or (3) with the knowledge of their falsity when made are also sanctionable under rule 13.  Tex. R. Civ. P. 13; *Nath*, 446 S.W.3d at 362–63.

Generally, courts presume pleadings and other papers are filed in good faith.  *Nath*, 446 S.W.3d at 361.  The party seeking sanctions bears the burden of overcoming this presumption of good faith.  *Id.*

**Propriety of Sanctions For Filing Invasion of Privacy Claim**

In his first through third issues, Allison challenges the award of sanctions for filing the invasion of privacy claim under both chapter 10 and rule 13.  But because either a finding of groundlessness or improper purpose can support a sanctions award under chapter 10—as opposed to both findings being necessary to impose sanctions under rule 13—we will first review the propriety of sanctions under chapter 10.  *See, e.g., id. at* 366 n.14 ("While bad faith must be coupled with groundless pleadings to support sanctions under Rule 13, an improper purpose alone is a sufficient predicate for sanctions under Chapter 10." (citations omitted)); *Bennett v. Reynolds*, No. 03-12-00568-CV, 2014 WL 4179452, at *13 (Tex. App.—Austin Aug. 22, 2014, pet. denied) (mem. op.) ("In other words, Chapter 10 authorizes sanctions where a lawyer or party files a pleading that is either groundless or brought for an improper purpose, and does not require both.").

In an appeal from a bench trial, the trial court's findings of fact have the same force and effect as jury findings.  *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991).  Because Allison has not challenged specific

findings of fact, they are binding on this court unless there is no evidence to support them or the contrary is established as a matter of law. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986). When the appellate record contains a reporter's record, findings of fact on disputed issues are not conclusive and may be challenged for sufficiency of the evidence. *Sixth RMA Partners, L.P. v. Sibley*, 111 S.W.3d 46, 52 (Tex. 2003); *Fraser v. Purnell*, No. 05-13-01269-CV, 2015 WL 4481702, at *3 (Tex. App.—Dallas July 23, 2015, no pet. h.) (mem. op.). Allison contends that there is no evidence to support the trial court's finding that he filed Wife's invasion of privacy claim for an improper purpose.

In their pleadings and at the sanctions hearing, appellees focused on the timing of the filing of the invasion of privacy claim in contending that it was brought for an improper purpose. *See, e.g.*, *Harden v. Merriman*, No. 02-12-00385-CV, 2013 WL 5874708, at *7 (Tex. App.—Fort Worth Oct. 31, 2013, no pet.) (mem. op.) (citing authorities that under chapter 10 and rule 13, relevant time period for court to consider is when pleading is filed). The evidence showed that in discharging Allison and settling the divorce in June 2010, Wife agreed to accept a payment of $100,000 from Husband in lieu of Husband's paying directly to Allison $100,000 in fees that Judge Wells had previously ordered Husband to pay Allison in a temporary order. Allison testified that after the settlement but before he filed the invasion of privacy claim, Wife contacted him and agreed to pay him the $100,000 when she received it from Husband in exchange for

15

Allison's remaining her counsel in this suit. Allison also testified that Wife had a hard time collecting the $100,000 and that Husband had instead paid it into the divorce court's registry and "began to charge all kinds of things against her when she was unrepresented."

Allison testified that he filed the invasion of privacy claim in this suit because he could not file it in the divorce as a result of Judge Wells's order prohibiting discovery from the Companies. But in his response to the amended sanctions motion, Allison asserted that Wife told him that "nothing more would be need[ed] for [this] litigation." He then attributed the continuation of this suit to the Meeker Entities' filing of their motion for summary judgment even though it was filed after he filed the invasion of privacy claim for Wife.

The trial court made the following finding pertinent to the invasion of privacy claim:[11]

> Allison's and [Wife's] contention that [Wife] actually suffered mental anguish is undermined by Allison's admission that neither of them pursued their request in the Divorce Proceeding that the surveillance be discontinued until early February 2010. Indeed, the fact that the request was first made in March 2009, but never pursued until almost a year later, renders [Wife's] and Allison's testimony with respect to any alleged mental anguish not credible. [Footnote omitted.]

---

[11]Although this finding of fact was included in the findings related to whether the invasion of privacy claim was groundless, it nevertheless also pertains to the findings in the bad faith/improper purpose section of the order.

16

As a result, it concluded the following:

> 3. In addition, [Wife] and Allison both claimed that the [Meeker Entities'] claims were released by a mutual release entered on or about June 15, 2010. Nonetheless, they brought the invasion of privacy claim even though [appellees'] underlying acts all occurred before the mutual release was allegedly entered. Either they believed the mutual release was effective or they believed it was not.
>
> . . . .
>
> 7. Several aspects of the status of events weigh in favor of a bad faith and/or harassment finding. Though this case has been pending since February 2009 (shortly after the surveillance began), [Wife] and Allison never chose to assert the [i]nvasion of [p]rivacy claim in this matter until July 29, 2010; this was five months after the discovery period ended and just one month before the second trial setting. Moreover, they brought the claim after [Wife] entered what both she and Allison later claimed was a valid mutual release of all claims between the parties. Then after filing the new claim, [Wife] and Allison used it as a reason to delay the impending trial date. [Internal citations omitted.]

We conclude and hold that the evidence supports the trial court's findings and conclusions that the invasion of privacy claim was brought in bad faith or for the improper purposes of harassment or delay. If, as Allison and Wife contended, they thought that the parties had agreed to a binding mutual release of claims such that "nothing more would be need[ed]" in this suit, there was no reason to bring the invasion of privacy claim. *See Nath*, 446 S.W.3d at 360–61 (concluding that evidence that irrelevant pleading against third party had been filed to leverage a settlement with original defendants was evidence of improper purpose); *see also Nolte v. Flournoy*, 348 S.W.3d 262, 269–70 (Tex. App.—Texarkana 2011, pet. denied) (holding that suit filed in response to counteroffer

17

for purchase of property with disputed ownership was filed for improper purpose of attempting to obtain better price); *Trantham v. Isaacks*, 218 S.W.3d 750, 754–55 (Tex. App.—Fort Worth, pet. denied) (holding that filing suit in attempt to preclude potential liability for negative public statements about political opponent through pleadings, or in attempt to have court resolve political debate, was improper under section 10.001(1)), *cert. denied*, 552 U.S. 892 (2007). Much of the pleading is written in the present tense, as if the surveillance were still ongoing, and one of the types of the relief requested is an injunction. Neither Allison nor Wife presented evidence—or even contended—that any surveillance occurred after Judge Wells ordered that it be ceased.

And, finally, the following evidence supports the conclusion that at the time the invasion of privacy claim was filed, it was not filed because of a need to end the surveillance or compensate Wife for mental anguish damage caused by the surveillance: (1) the delay in asking the divorce court to stop the surveillance; (2) the delay in filing the invasion of privacy claim in this suit; (3) evidence that Wife had waved to and conversed with the detectives performing the surveillance while it was ongoing; and (4) in the summer of 2009 the parties had worked out with the amicus attorney how best to discuss the surveillance with the children. Indeed, the evidence supports a conclusion that the claim was filed as an attempt to salvage some cash from the divorce that Allison and Wife were not otherwise going to be paid. Filing a claim after the discovery period had ended in an attempt to delay until a settlement could be reached would fall within the ambit of

18

sanctionable conduct described by section 10.001(1). *See, e.g.*, *Nath*, 446 SW.3d at 360–61. Accordingly, we conclude and hold that the trial court did not abuse its discretion by awarding sanctions against Allison under section 10.001(1). We overrule Allison's third issue.[12]

**Propriety of Sanctions for Sponsoring Purported Affidavit**

In his fourth issue, Allison claims that there is no evidence supporting the trial court's award of sanctions for filing Wife's response to the motion for summary judgment with the defective Purported Affidavit attached.

The trial court's extensive fact findings show that the judge did not believe Wife's representations at the motion for continuance hearings, and at one of the sanctions hearings, that she had either never seen or signed the Purported Affidavit or had signed only a blank page and returned it. Instead, the trial court found that Wife signed the Purported Affidavit between October 11 through October 14, 2010, but not before the notary, and that she did not swear to its contents.

The trial court also found that the Purported Affidavit "played a central role in [Wife] and Allison's efforts to avoid summary judgment" and "[b]ecause of its role in attempting to defeat summary judgment, and because [appellees] had no way of knowing that the 'affidavit' was simply unsworn, inadmissible hearsay,

---

[12]Because his third issue is dispositive of the propriety of the sanctions award regarding the invasion of privacy claim, we need not address his first and second issues contending that there is no evidence that the claim was groundless. *See* Tex. R. App. P. 47.1.

their counsel prepared and filed various objections to the Purported Affidavit and

a reply brief addressing why summary judgment should nonetheless be granted."

The trial court also made the following pertinent conclusions of law:

> 9. When attempting to defeat the [Meeker Entities'] motion for summary judgment, Allison filed [Wife's] "Purported Affidavit." Allison represented both in his pleading and in court that the document was a true "affidavit." Allison made these representations even though [Wife] never swore to the document's contents and such contents were altered between the time [Wife] received it and the time it was filed.[13]

> 10. In addition, documents filed by Allison and/or persons working under his authority have made various, inconsistent representations to this Court concerning the document's creation and notarization. Specifically, such pleadings and attachments claim that [Wife] signed the document on October 11; that she signed the document on October 12; that she signed the document on October 13; and that she signed the document in person before Allison's paralegal and notary, Smith. None of these representations are true.

> 11. Further, the document trail establishes that Allison allowed his paralegal to notarize the document illegally, and then submitted it to this Court to support a summary judgment response; in short, he submitted a document as an "affidavit," but failed to disclose it was materially defective and facially misleading.

> 12. Though Allison contends that he was unaware that the document was not properly sworn, such would not change the Court's conclusions. First, in light of the evidence, the Court simply does not find such testimony credible. Second, Texas Disciplinary Rule of Professional Conduct 5.03 requires a lawyer to ensure that the conduct of nonlawyers under his supervision is compatible with the lawyer's professional obligations. Texas case law has long-required the same. Moreover, the best that can be said of Allison's

---

[13]The evidence showed that Allison's paralegal made nonsubstantive revisions to the body of the Purported Affidavit after Wife sent her the signed version.

conduct is that he recklessly allowed those working directly under him to receive an unsworn, faxed copy of an intended affidavit; make changes to the body of the affidavit; notarize the document after the fact; and then file it with the court with nothing to reflect its myriad of shortcomings. Such behavior simply cannot escape sanction.

13. Moreover, supervising lawyers are required to take remedial steps upon learning of a nonlawyer's misconduct. On this record, it does not appear that Allison took any remedial step at any time up through and including the conclusion of this sanctions hearing. [Internal citations and footnote omitted.]

Allison contends that there is no requirement that a person sign an affidavit in a notary's physical presence. The government code defines an affidavit as "a statement in writing of a fact or facts signed by the party making it, sworn to before an officer authorized to administer oaths, and officially certified to by the officer under his seal of office." Tex. Gov't Code Ann. § 312.011(1) (West 2013). That definition contains the statutory requirements for an affidavit. *Mansions in the Forest, L.P. v. Montgomery Cnty.*, 365 S.W.3d 314, 316 (Tex. 2012). When an affidavit meets the government code's requirements, it may be presented as summary judgment evidence if it also complies with rule of civil procedure 166a(f). *See* Tex. R. Civ. P. 166a(f); *Mansions in the Forest, L.P.*, 365 S.W.3d at 316. When a written statement does not meet this basic definition, however, it is "no affidavit at all." *Mansions in the Forest, L.P.*, 365 S.W.3d at 316.

In the absence of any statutory definition, we are to give words used in a statute their common meanings unless a different meaning is apparent from the context or such a construction leads to absurd or nonsensical results. *Ross v. St. Luke's Episcopal Hosp.*, 462 S.W.3d 496, 501 (Tex. 2015). Webster's Third

21

New International Dictionary defines "before" as "in the presence of[,] face to face with." Webster's Third New International Dictionary 197 (2002). It would not be out of context with other statutes to construe the word "before" in the phrase, "sworn to before an officer authorized to administer oaths," as requiring that an affidavit must be sworn to in the officer's physical presence. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 121.003(1), .004(a), .006(b)(1) (West 2011) (relating to the acknowledgement of a document "before" a notary); Tex. Gov't Code Ann. § 406.009(a), (d)(5) (West 2013), *as amended by* Act of May 25, 2015, 84th Leg., R.S., ch. 766, § 2, 2015 Tex. Sess. Law Serv. 2316, 2317 (West) (providing that Secretary of State has good cause to suspend or revoke the commission of a notary public for "performing any notarization when the person for whom the notarization is performed did not personally appear before the notary at the time the notarization is executed"); *cf. Smith v. State*, 207 S.W.3d 787, 790–91 (Tex. Crim. App. 2006) (distinguishing affiant's signature as memorialization of fact that oath was taken, not as oath itself, and discussing purpose of oath in context of code of criminal procedure requirement that search warrant affidavit be sworn to, noting that the purpose of the administration of an oath is to call upon the affiant's moral duty to tell the truth and instill a sense of seriousness and responsibility regarding that oath). Likewise, neither would such a construction lead to absurd or nonsensical results.

Moreover, although an affidavit is not required to have a jurat affixed to meet the statutory definition of an affidavit,[14] the Purported Affidavit contained one signed by the notary stating that Wife had both signed and sworn to the affidavit "before" the notary. Thus, even if government code section 312.011(1) does not require an affiant to swear to the affidavit's truth in the physical presence of a notary, the jurat on the Purported Affidavit falsely claimed that Wife had done so. *See Olsen v. Comm'n for Lawyer Discipline*, 347 S.W.3d 876, 883–84 (Tex. App.—Dallas 2011, pet. denied) (describing jurat on purported self-proving will as "false" when witness did not sign in notary's physical presence as stated in the jurat). Nothing in the evidence shows that Wife swore to the truth of the Purported Affidavit's contents before the notary.

The evidence supports the trial court's findings and conclusions. Allison testified about the difficulty he and his paralegal had getting Wife to come by his office to sign an affidavit to attach to the summary judgment response. Although Allison testified that he needed to file a response by the deadline set forth in the rules, he acknowledged that he could have filed a motion seeking leave to file a late response. He consistently testified that he had no specific memory of when Wife signed the Purported Affidavit other than what his fax and email records showed. However, he also testified that he did not believe Wife signed and faxed the affidavit to his paralegal and then drove to his office to swear to its contents.

---

[14]Tex. Gov't Code Ann. § 312.011(1); *Mansions in the Forest, L.P.*, 365 S.W.3d at 316; *see also* Tex. R. Civ. P. 166a(f).

Allison said that if he followed his usual procedure, he finalized the form of the motion on the morning of October 14, 2010 before leaving the office to go to the courthouse and left the finalizing and execution of the Purported Affidavit to his paralegal, who would have obtained a signed version of the Purported Affidavit and filed it with the summary judgment response that same day. Thus, the evidence supports a conclusion that Allison—who testified that he drafted the Purported Affidavit that included the jurat—should have known that his paralegal could not have accomplished having Wife swear to the Purported Affidavit in her presence before filing the response.

That Allison did not personally witness the manner in which the Purported Affidavit was obtained and attached to the response that his paralegal filed does not absolve him of responsibility for its filing. *See* Tex. Disciplinary R. Prof'l Conduct, 5.03, *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G, app. A (West 2013) (describing lawyer's responsibilities regarding nonlawyer assistants); *cf. Big Country Elec. Co-op, Inc. v. Hill*, No. 11-09-00368-CV, 2011 WL 5307858, at *3 (Tex. App.—Eastland Nov. 3, 2011, no pet.) (mem. op.) (acknowledging, in holding that sanctions could not be assessed against client for paralegal's conduct, that attorney could be held responsible for that conduct). Allison testified that he relied on his paralegal's knowledge of how the Purported Affidavit was executed to determine whether to file it; if she had told him that Wife did not need to sign it in her presence for it to be valid, he would have filed it. But Allison was responsible for ensuring that what he attached to the summary

24

judgment response as affidavit evidence was truly what he represented it to be. *Cf. Sellers v. Foster*, 199 S.W.3d 385, 401–02 (Tex. App.—Fort Worth 2006, no pet.) (holding that trial court did not abuse its discretion by determining that attorney who relied on her assistant to send expert report but did not confirm that assistant did so was consciously indifferent in failing to file report timely).

Additionally, he argues that he cannot be held responsible for his assistant's actions in improperly notarizing the document because he does not have supervisory authority over a notary. However, the trial court's concern was with the paralegal's filing of the summary judgment response with the Purported Affidavit attached, and Allison's failure to attempt to remedy the matter after it was discovered, not Allison's supervision of the paralegal in her notarial duties. Allison specifically testified that he relied on his paralegal, at his direction, to file the document in the proper form. Additionally, he personally signed the response, which stated that "[t]his response depends on the following evidence included in the appendix: a. Affidavits. Affidavit of Mindy Meeker as Exhibit 'A'." Even after researching how the Purported Affidavit was signed and returned, and finding the fax copy that Wife signed and returned on October 14, 2010, the day the Purported Affidavit was filed with the summary judgment response, Allison never attempted to amend the response with a properly sworn affidavit or withdraw the Purported Affidavit.[15]

_____

[15]We recognize that by the time Allison was able to investigate the alleged problems Wife raised with the Purported Affidavit, Wife was no longer

25

Accordingly, we conclude and hold that the evidence supports the trial court's conclusion that the Purported Affidavit was filed for an improper purpose, namely to avoid summary judgment on both the merits of the Meeker Entities' claims but also to avoid a dismissal of the invasion of privacy claim that had likewise been improperly filed to leverage Wife's position in this suit. *See Skepnek v. Mynatt*, 8 S.W.3d 377, 380–83 (Tex. App.—El Paso 1999, pet. denied) (affirming sanctions against attorney who filed special appearance with affidavit containing false statements attached). We overrule Allison's fourth issue.

## Reasonableness of Sanctions Award

In his fifth issue, Allison contends that the sanctions award for filing the Purported Affidavit is excessive, that the evidence of the Meeker Entities' attorney's fees was not properly segregated between fees related to his conduct versus Wife's, and that neither the record nor the trial court's sanctions order identifies a nexus between the fees awarded as sanctions and the underlying conduct. He also challenges the award of $3,000 for Ginn's lost time in researching the claim and attending hearings.

Sanctions must not be either unjust or excessive. *Nath*, 446 S.W.3d at 363. A complaint that sanctions are unjust or excessive must be raised at trial.

---

cooperating with him and Allison had sought to withdraw. However, he continued to maintain that the Purported Affidavit was competent summary judgment evidence.

26

*See* Tex. R. App. P. 33.1(a)(1); *The Shops at Legacy (Inland) Limited P'ship v. Fine Autographs & Memorabilia Retail Stores, Inc.*, No. 05-14-00889-CV, 2015 WL 2201567, at *2–3 (Tex. App.—Dallas May 8, 2015, no pet. h.) (mem. op.); *Gott v. Rice Consol. ISD*, No. 01-07-00051-CV, 2008 WL 4670257, at *8 (Tex. App.—Houston [1st Dist.] Oct. 23, 2008, no pet.) (mem. op.). Allison did not complain about the excessiveness of the sanctions award in the trial court. Moreover, his argument on appeal regarding excessiveness addresses the merits of the imposition of sanctions against him rather than Wife, not the amount of fees awarded; we have already concluded that the trial court's imposition of sanctions against Allison was supported by the evidence of his conduct. Thus, we conclude that Allison has not preserved his excessiveness complaint, apart from his complaint on the underlying merits of the imposition of sanctions, for review.

But Allison did file written objections to Warren's attorney's fees affidavit as well as the affidavit of Ginn's counsel Robert W. Bush in which Allison complained about the attorneys' failure to segregate their fees between fees related to his conduct and fees related to Wife's with respect to the filing of both the invasion of privacy claim and the Purported Affidavit. Allison cites *Glass v. Glass*, in which the court reversed an award of sanctions against the client for her attorneys' actions in filing frivolous pleadings. 826 S.W.2d 683, 688–90 (Tex.

27

App.—Texarkana 1992, writ denied).[16]    However, depending on the facts adduced in a sanctions proceeding, a trial court may be justified in finding that both the attorney and client were responsible for filing—and causing to be filed—a sanctionable pleading. *See* Tex. Civ. Prac. & Rem. Code Ann. § 10.004(a) ("A court that determines that a person has signed a pleading or motion in violation of Section 10.001 may impose a sanction on the person, a party represented by the person, or both."); *Sluder v. Ogden*, No. 03-10-00280-CV, 2011 WL 116058, at *4 (Tex. App.—Austin Jan. 13, 2011, pet. denied) (mem. op.) (holding that trial court could have reasonably determined that client was complicit in filing of frivolous suit, thereby justifying sanctions against both attorney and client).

According to Allison, the record shows that most of the misconduct was Wife's and that he could not be jointly and severally liable for the "entire sanctions proceedings when he was her target and not her ally." We have set forth the trial court's findings and conclusions in detail, which we have concluded are supported by the evidence. The trial court found that even though both Wife and Allison said they believed all claims in the suit had been released, they nevertheless were responsible for the subsequent filing of the invasion of privacy

---

[16]Allison also cites *Metzger v. Sebek*, 892 S.W.2d 20 (Tex. App.—Houston [1st Dist.] 1994, writ denied), *cert. denied*, 516 U.S. 868 (1995), in support of his argument. But that court did not hold that a party could not be sanctioned jointly and severally with counsel when both of them had committed misconduct in signing a pleading; instead, that court held that imposing joint and several liability of $994,000 was excessive in light of Metzger's one act of lying in an affidavit. *Id.* at 52–53.

28

claim and Purported Affidavit. Contrary to Allison's arguments on appeal, the trial court clearly set forth the conduct it believed Allison engaged in with respect to both filings that was improper. And the effect of both Allison's and Wife's conduct was the same: not only were the Meeker Entities forced to go forward on claims they had agreed to release—because the invasion of privacy claim was filed *before* they filed their motion for summary judgment in this case, thus leaving them little choice in light of the fact that Wife did not sign the release— they also had to research and defend the invasion of privacy claim, including the propriety of the Purported Affidavit.[17] Allison did not testify, nor does he contend on appeal, that he filed either the invasion of privacy claim or Purported Affidavit for Wife against his will. The same reasoning likewise applies to Ginn; additionally, because he was brought into the suit solely because of the invasion of privacy claim, there was no need to segregate his fees further. *See* Tex. Civ. Prac. & Rem. Code Ann. § 10.004(c)(3); *Softech Int'l, Inc. v. Diversys Learning, Inc.*, No. 03-07-00687-CV, 2009 WL 638203, at *7 (Tex. App.—Austin Mar. 13, 2009, no pet.) (mem. op.). Because the trial court's sanctions award for the filing of the Purported Affidavit was based on the costs and fees incurred by Ginn and

---

[17]Allison contends that the fact that the Purported Affidavit was not sworn is immaterial because Wife had already submitted a substantially similar affidavit in connection with the motion to end the surveillance in the divorce proceeding. But because an unsworn document is not an affidavit—and therefore not evidence for summary judgment purposes—appellees would not have needed to reply to Allison's response to prevent a denial of their motion for summary judgment had they known the Purported Affidavit was not what Allison had represented it to be.

the Meeker Entities as a direct result of both Allison's and Wife's sanctionable conduct as described above—and likewise described with particularity in the detailed sanctions order—we hold that the trial court did not abuse its discretion in ordering Allison and Wife to pay the sanctions jointly and severally. *See Bennett*, 2014 WL 4179452, at \*15; *Softech Int'l, Inc.*, 2009 WL 638203, at \*7; *Thottumkal v. McDougal*, 251 S.W.3d 715, 718 (Tex. App.—Houston [14th Dist.] 2008, pet. denied).

Allison also complains that the trial court's order cites no authority for the award of $3,000 to Ginn for his lost time, which we construe as an argument that there is no evidence to support Ginn's lost time as a basis for recovery. However, civil practice and remedies code section 10.004(c)(3) allows a trial court to award a party "reasonable expenses incurred by the other party because of the filing of the pleading or motion." Tex. Civ. Prac. & Rem. Code Ann. § 10.004(c)(3). Ginn testified that he expended personal time researching the facts alleged by Wife in her invasion of privacy claim.[18]

Finally, Allison contends that the attorney's fees awarded as sanctions improperly include $95,820.41 in attorney's fees awarded to the Meeker Entities separately for prevailing on their motion for summary judgment. Allison did not raise this complaint in the trial court; therefore, he failed to preserve it for review.

---

[18]Allison has not challenged the sufficiency of the evidence to support the amount of the lost time award.

30

*See* Tex. R. App. P. 33.1(a)(1); *Holland v. Hayden*, 901 S.W.2d 763, 765 (Tex. App.—Houston [14th Dist.] 1995, writ denied).

Accordingly, we overrule Allison's fifth issue.

**Conclusion**

Having overruled Allison's dispositive issues, we affirm the trial court's sanctions order against Allison.

/s/ Terrie Livingston

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; WALKER and GABRIEL, JJ.

DELIVERED:  August 31, 2015